J-S48013-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DAVID HUERTAS | : | |
| | : | |
| Appellant | : | No. 605 EDA 2019 |

Appeal from the PCRA Order Entered February 4, 2019
In the Court of Common Pleas of Lehigh County Criminal Division at
No(s):  CP-39-CR-0001251-2015

BEFORE:   BOWES, J., SHOGAN, J., and STRASSBURGER, J.[*]

MEMORANDUM BY BOWES, J.:                     **FILED JANUARY 24, 2020**

David Huertas appeals from the February 4, 2019 order denying his petition for relief under the Pennsylvania Post-Conviction Relief Act, (the "PCRA").  After careful review and consideration, we affirm.

A jury convicted Appellant of various offenses related to serial sexual assaults he perpetrated against his minor stepdaughters, L.M. and N.D.  The underlying factual history of this case was well-summarized by a prior panel of this Court that adjudicated Appellant's direct appeal:

> In the instant case, the testimony at trial revealed that L.M. is a 15 year old girl, with a date of birth [in] May 2000.  Additionally, N.D. is a 13 year old girl, with a date of birth [in] September 2002. [Appellant] is L.M.'s and N.D.'s stepfather.  Appellant was the only father whom L.M. and N.D. knew, as he had been in their lives since they were very young.

_____

[*] Retired Senior Judge assigned to the Superior Court.

Starting in the summer of 2011, when L.M. was approximately eleven (11) years old, Appellant called her into his bedroom and touched her "in ways that she did not like." At that time, L.M. was living at 714 Washington Street, Allentown, Lehigh County, Pennsylvania. . . . [A]t one time, there were fourteen (14) people living in the residence.

During the time that L.M. lived at the residence on Washington Street, Appellant frequently would touch her breasts under and over her clothes. He also would frequently touch her vagina, both over and under her clothes. By "touch", L.M. explained that Appellant would use his hand and his penis to glide over and penetrate the inside of her vagina. This "touching" would occur when Appellant was alone with L.M. in his bedroom, and happened multiple times. Appellant instructed L.M. to do certain things, such as touch his penis. L.M. testified that Appellant's penis was big and hard to the touch. In addition, L.M. explained that she also "touched" Appellant's penis with her mouth. This occurred nearly every time. Even though L.M. did not want to do such actions, she was afraid to say "no" to her stepfather. She feared that Appellant would get mad and exhibit an attitude and take his anger out on everyone around him. L.M. did not report this "touching" to anyone, because she did not think that anyone would believe her.

There were times when L.M.'s sister, N.D., was also present. L.M. witnessed N.D. "touching" Appellant's penis as to Appellant instructed her to so do. On November 1, 2013, L.M., N.D. and their family moved to a residence located at 1739 Hanover Avenue, Allentown, Lehigh County, Pennsylvania. As on Washington Street, L.M. and N.D. were living with Appellant, their mother, their younger sister, and their brother. Appellant's mother lived with them on Hanover Avenue as well.

The "touching" continued to occur at the Hanover residence. Appellant would frequently call L.M. and/or N.D. into his bedroom, and make L.M. and/or N.D. touch his penis. He would make them take off their clothes and he would touch L.M.'s breast and butt. Appellant would glide over and penetrate L.M.'s vagina with his penis. He would also rub his penis against the outside of N.D.'s vagina. After he was "satisfied" and ejaculated, he would wipe off the ejaculation.

At times, when L.M. was 13 or 14 years old, and N.D. was 11 or 12 years old, Appellant had N.D. hold his penis with her hand while L.M. put her mouth on Appellant's penis. Appellant also had N.D. put her mouth on his penis while L.M. held his penis.

N.D. was also "touched" by Appellant when L.M. was not present. N.D. specifically recounted that when she was 11 years old, Appellant "touched" her and had her put his penis in her mouth. Appellant had instructed her to take off her clothes and he had pulled his pants down, but not all the way off. Appellant touched her in her private parts using his hands and his penis. Although he never penetrated her vagina, he would rub his penis against her. N.D. testified that she did not want to do such acts, but that Appellant offered her money to do them.

In November of 2014, N.D. confided in her best friend at school about the "touching" that was going on with Appellant. She mentioned it again to this friend in January of 2015. Thereafter, on February 4, 2015, at approximately 7:39 A.M., L.M. sent her aunt, Eraka Rivera Cruz, a text message, implying that someone was "touching" her. When L.M. actually spoke with her aunt on the telephone, she told her that Appellant had been touching her. The aunt advised her to inform her mother of same. L.M. took her aunt's advice and told her mother. That day, both Appellant and the mother picked L.M. up from school. Appellant took L.M.'s cell phone when she entered the vehicle. Her mother yelled at her when they returned home. When N.D. supported her sister's account of what had been transpiring, her mother yelled at her and slapped her. The next day, L.M. borrowed a telephone from her friend at school and called her aunt again. Her aunt notified the police of what L.M. had confided in her, and subsequent medical examinations were performed on L.M. and N.D.

*Commonwealth v. Huertas*, 178 A.3d 169 (Pa.Super. Sept. 19, 2017)

(unpublished memorandum)

The remaining procedural history of this case was aptly summarized by

the PCRA court as follows:

At the conclusion of a jury trial conducted from December 1, 2015[,] through December 3, 2015, [Appellant] was found guilty of rape of a child, two (2) counts of involuntary deviate sexual

intercourse with a person less than 16 years of age, involuntary deviate sexual intercourse with a child, aggravated indecent assault with complainant less than 16 years of age, two (2) counts of corruption of minors with defendant age 18 or above, and indecent assault of a person less than 16 years of age. Thereafter, on April 29, 2016, [the trial court] sentenced [Appellant] to an aggregate term of state imprisonment of less than sixty (60) years nor more than one hundred forty (140) years. Thereafter, on May 9, 2016, [Appellant] filed a timely motion for post[-]sentence relief pursuant to Pennsylvania Rule of Criminal Procedure Rule 720. In his post[-]sentence motion, the Defendant filed a motion in arrest of judgment challenging both the sufficiency and weight of the evidence, a motion for new trial based on after-acquired evidence, and a motion for new trial due to errors in the conduct of trial.[1] [The trial court] denied Defendant's motion for post[-]sentence relief on June 1, 2016. Then, on June 23, 2016, the Defendant filed a notice of appeal. Subsequently, on September 19, 2017, the Superior Court of Pennsylvania affirmed [the trial court's] judgment and sentence.

PCRA Court Opinion, 2/5/19, at 1-2 (unnecessary capitalization omitted).

---

[1] Appellant preserved an argument that the trial court "committed error by allowing the Commonwealth's expert witness to testify that she believed the victims' testimony of sexual assault thereby allowing the expert witness to testify beyond her admissible scope and render an opinion as to the truth of the victims' testimony." Appellant's Motion for Post-Sentence Relief, 5/9/16, at ¶ 8. This claim for relief was denied by the trial court. **See** Trial Court Opinion, 6/2/16, at 13 ("It was not improper for [Dr. Jenssen] to answer defense counsel's direct question and opine that, based on studies and statistics, she believed the statements made by L.M. and N.D. and took them at face value."). This claim was abandoned on direct appeal despite being included in Appellant's Rule 1925(b) statement. **Compare** Appellant's Rule 1925(b) Statement, 7/19/16, at ¶ 5(c), **with Commonwealth v. Huertas**, 178 A.3d 169 (Pa.Super. Sept. 19, 2017) (unpublished memorandum). A similar issue has been raised in this appeal under the auspices of ineffectiveness. For the purposes of this appeal, Appellant's claim is **not** considered "previously litigated" under the PCRA. **See Commonwealth v. Smith**, 995 A.2d 1143, 1150 (Pa. 2005) ("[I]neffectiveness claims are distinct from claims raised on direct appeal, and must be treated as wholly independent of underlying claim of error.").

On September 10, 2018, Appellant filed a timely, *pro se* PCRA petition. The PCRA court appointed counsel to represent Appellant, who prepared and filed a timely amended PCRA petition. In relevant part, Appellant argued that "trial counsel rendered ineffective assistance of counsel as a result of his failure to object to certain portions of Dr. Debra Esernio-Jenssen's testimony during direct examination and his failure to properly cross-examined [Dr. Jenssen]." Appellant's Amended PCRA Petition, 12/18/18, at ¶ 15. On January 28, 2019, a PCRA hearing was held at which trial counsel testified and argument was presented. The PCRA court denied Appellant's petition on February 4, 2019, and Appellant filed a timely notice of appeal. Thereafter, the PCRA court directed Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), Appellant timely complied, and the PCRA court entered its Rule 1925(a) opinion. This case is now ripe for our review.

Appellant has presented a well-reasoned summary of his claim for relief:

The [PCRA] court erred in failing to find trial counsel ineffective when trial counsel repeatedly elicited testimony from an expert witness as to the credibility of witnesses, which bolstered the witnesses' credibility and improperly invaded the province of the jury, and is inadmissible pursuant to 42 Pa.C.S. § 5920(b)(3). Trial counsel raised no objections to statements from the [Commonwealth's expert] testimony which improperly vouched for and/or bolstered the testimony of witnesses. Trial counsel had no reasonable strategic basis for his actions and but for counsel's actions, a reasonable probability exists that the outcome of the proceedings would have been different.

Appellant's brief at 12. Thus, Appellant is requesting a new trial due to his trial counsel's allegedly ineffective assistance.

Our standard and scope of review in the context of a petition for relief pursuant to the PCRA is well-established under existing precedent. Our standard of review is "limited to determining whether the PCRA court's findings are supported by the record and without legal error." **Commonwealth v. Edmiston**, 65 A.3d 339, 345 (Pa. 2013). Furthermore, "[o]ur scope of review is limited to the findings of the PCRA court and the evidence of record, viewed in the light most favorable to the prevailing party at the PCRA court level." **Commonwealth v. Koehler**, 36 A.3d 121, 131 (Pa. 2012). The PCRA court's credibility determinations are binding upon this Court to the extent that they are supported by the record. **See Commonwealth v. Spotz**, 18 A.3d 244, 259 (Pa. 2011) ("**Spotz I**"). However, we will apply a *de novo* standard of review with regard to the PCRA court's legal conclusions. **Id**.

Section 5920 sets forth the scope of testimony of experts in criminal proceedings that concern sexual offenses at 18 Pa.C.S. §§ 3101-44, and/or offenses for which registration is required pursuant to 42 Pa.C.S. §§ 9799.10-.42. **See** 42 Pa.C.S. §§ 5920(a)(1)-(2). This statute permits experts to offer their "opinions regarding specific types of victim responses and victim behaviors," but specifically precludes opinions addressing "the credibility of any other witness, including the victim." **Commonwealth v. Cramer**, 195 A.3d 594, 608 (Pa.Super. 2018).

In pertinent part, § 5920 provides as follows:

**(b) Qualifications and use of experts.—**

(1) In a criminal proceeding subject to this section, a witness may be qualified by the court as an expert if the witness has specialized knowledge beyond that possessed by the average layperson based on the witness's experience with, or specialized training or education in, criminal justice, behavioral sciences or victim services issues, related to sexual violence, that will assist the trier of fact in understanding the dynamics of sexual violence, victim responses to sexual violence and the impact of sexual violence on victims during and after being assaulted.

(2) If qualified as an expert, the witness may testify to facts and opinions regarding specific types of victim responses and victim behaviors.

(3) The witness's opinion regarding the credibility of any other witness, including the victim, shall not be admissible.

42 Pa.C.S. 5920(b).

Instantly, Appellant's claim relates to testimony adduced by both the Commonwealth and Appellant's own trial counsel from Dr. Jenssen, who was qualified as an expert in the areas of pediatrics and child abuse pediatrics by the trial court. *See* N.T. Trial II, 12/2/2015, at 74. In addition to being an expert in the above-noted fields, Dr. Jenssen also examined L.M. and N.D. on two separate occasions with the assistance of a nurse practitioner. The examination commenced with a full history from both victims, followed by a general physical examination and an ano-genital exam to ascertain whether there was any physical evidence of sexual abuse. *Id.* at 75-78.

In relevant part, Dr. Jenssen's direct testimony included the following portions of relevant testimony that were flagged as problematic during oral argument before the PCRA court, **see** N.T. PCRA Hearing II, 1/28/19, at 7-14, and in Appellant's briefing before this Court, **see** Appellant's brief at 8-9. That testimony began as follows:

> Q:    When L.M. was giving her history did you notice anything about her demeanor?
>
> A:    Yes.
>
> Q.    What did you notice?
>
> A:    She was very – she had a very sad affect. She was often very tearful when she was providing [her] history.
>
> Q:    Okay. And what was the history she provided to you?
>
> A:    She provided that she had – he knew why she was there, that she had had [sic] – she was sexually abused by an individual that she named as David Huertas. I don't know if I'm saying it correctly. I can spell it – H-U-E-R-T-A-S. She said he was about 45 years old and he was her stepfather.

**Id**. at 78-79.

Thereafter, Dr. Jenssen testified that L.M.'s physical exam was inconclusive and did not disclose any direct physical evidence of sexual abuse. Nonetheless, Dr. Jenssen opined that L.M.'s history and physical exam were consistent with the allegations, particularly because such physical evidence typically does not endure when reporting of abuse is delayed. **Id.** at 80-82.

Dr. Jenssen's testimony then continued regarding N.D.'s examination:

> Q:    Okay. And you got a history from N.D.?

A:    Yes.

Q:    What history did N.D. provide you?

A:    Well, initially N.D. didn't even want to talk about it. And then she kind of just blurted out that [Appellant], her stepfather, had done inappropriate things to her.

Q:    She talked about him touching her bottom with his hands and that she had to see his penis. But she was very sad and really did not want to talk about it.

*Id*. at 83.

Dr. Jenssen also testified that N.D., likewise, exhibited no physical signs

of abuse upon examination. *Id*. at 84-85. Thereafter, Dr. Jenssen explicitly

addressed N.D.'s seeming reluctance to discuss the allegations:

Q:    I want to talk about one of the things you said in your report specifically with N.D. You said in you report, "Disclosure of sexual abuse is a process, especially when the abuser is a parent or stepparent." Do you remember saying that in your report?

A:    Yes.

Q:    What do you mean by that?

A:    Intra-familial abuse is one of the most devastating things for a child. We know that based on evidence-based studies, advanced literature, that more than 50 percent of children that are abused as children don't disclose it until they're adults. Children are most often sexually abused by people they know, they love, and they trust. That can be very confusing to a child when the person who they care about, or other people like or love, it can be devastating to them in terms of establishing a trusting relationship with – in future relationships or even with adults. Sometimes there is implicit or explicit, like with both of these girls, pressure not to disclose. Sometimes there's threats, like for L.M., that she – [Appellant] would beat them if she told. And sometimes or older children they understand or they're fearful of what the consequences of their disclosure will bring. You know, in this case, it's their stepfather. Their mother was very much in love with this

man who was very kind to her. Or their relationship with him, it's still a parent figure.

*Id*. at 85-86. Dr. Jenssen then discussed the delayed reporting in this case, and expressed concern regarding L.M. and N.D.'s mother, who did not believe the allegations against Appellant:

> Q:    Also, going back to your statement that disclosure of sexual abuse is a process, and maybe this is just my interpretation, but tell me if I'm interpreting this correctly. Sometimes when they disclose they don't disclose everything right away.
>
> A:    Oh, that's very typical. In fact, not only is that so typical for adolescents, that's even very typical for adults who disclose sexual abuse that happened to them as a child. They test the waters. They test, like, is this a trustworthy person that I'm disclosing to? Are they going to believe me? They just give a little bit, you know, to test the waters. It was very clear to me, in my experience when I was talking with N.D., I felt that she was not yet ready to give her full disclosure. It was too painful for her. I felt that her sister was more forthright with what was going on.
>
> . . . .
>
> In this particular case, what they disclosed about their mother was very concerning to me, as I'm a provider and my responsibility is to ensure the safety and well-being – not only the physical safety and well-being but the emotional safety and well-being of the child – and I felt their mother reacted by not believing them, hitting them, and then just denying as if anything happened. And as a result of that they were not brought to medical attention until, you know, sometime after the disclosure.

*Id*. at 88-89 (emphasis added). Dr. Jenssen concluded her direct testimony by stating that all of her opinions recited above were rendered "to a reasonable degree of medical certainty." *Id.* at 89.

- 10 -

Appellant's trial counsel then engaged in the following line of questioning while cross-examining Dr. Jenssen concerning the truthfulness of the allegations made by L.M. and N.D. during their examinations:

Q:    When you say her mother had concerns, did you speak with her mother?

A:    I don't recall speaking with her mother.  So I'm assuming it was arranged through the social worker or somebody that works in my office.

Q:    Okay.  So, then, you're also assuming that the girls' mother hit them, or beat them, or did whatever it is that they told you she did.

A:    They told us she did.

Q:    When they – they told you that.

A:    That is correct.

Q:    That there was – you didn't inquire of the mother if this happened.

**A:    I think that they are both bright, you know, 12 and 14 year olds.  I think they could speak for themselves.**

Q:    You didn't inquire of the mother if she did that, right?

A:    Why would I?

**Q:    Well, you are coming in here today and you're telling these people that you've been told something.  And you're telling these people that obviously these children are telling you the truth.  That's what you're telling them.**

**A:    Yes.**

. . . .

Q:    You just take what they tell you at face value.

A:    When I am doing a medical evaluation and speaking to a child we ask the questions in an open-ended way. I am not saying to the child, "Did your mother hit you?" This was information that they provided freely to me. **So yes, in this particular case, I believe what they were telling me.**

Q:    You just accepted what they told you.

A:    Yes, other than what I said before about N.D. I felt that she was holding back, which, it's not me. It's what scientific studies have shown. Evidence based medicine have shown that disclosure is so delayed and such a difficult process because society doesn't want to believe children. This is why children delay until adulthood to disclose their childhood abuse. Sexual abuse is very common. About ten percent of the population is sexually abused and yet the majority wait until adulthood. It is because the people – the reason why they don't disclose is for just this, is because they don't feel that somebody is going to believe them.

. . . .

Q:    Okay. And is it your position to the jury that no child has ever lied about being abused, sexually abused?

. . . .

A:    **It is my position, and what is published in the literature, that very few children lie about sexual abuse, less than four percent.**

Q:    Okay.

A:    And most of the circumstances are involved with children who come from divorced or separation – ongoing divorce or separation. That's what's in the medical literature.

Q:    I asked – I simply asked you for your opinion, what you were telling the jury.

A:    Yes. And that's where – my opinion is based on my knowledge of, you know, and my ongoing knowledge of what's in the medical literature.

Q:    Okay.

**A:     So it is extremely unusual for children to lie, less than four percent in published studies.**

Q:     May I continue?

A:     Yes, please.

*     *     *

Q:     Okay.  The second examination of L.M. says that her mother is better now.  Do you recall that?

A:     Yes.

Q:     She seems to care now?

A:     That's what the child said.

Q:     Do you remember that?

A:     Yes.

**Q:     And, so, do you believe, since everything else that the children told you you believe, you believe that as well[?]**

**A:     I believe what the child was telling me, yes.**

Q:     Okay.  So after the second examination everything between mother and daughter was better now, right?  They were the words.

A:     Whatever words exactly I put in my note.  I don't remember specifically other than that she did say that things were better with her mother.

Q:     And she – her mom seems to care now.

A:     That's what she said.

*Id*. at 96-102 (emphasis added).

Based on the foregoing testimony, Appellant avers that trial counsel's decision not to object under § 5920 to Dr. Jenssen's testimony regarding the credibility of L.M. and N.D. on both direct and cross examination, coupled with trial counsel's strange decision to adduce additional testimony along the same lines, constitutes ineffective assistance of counsel under the PCRA.

To prevail in a PCRA proceeding upon a claim of ineffectiveness of counsel, *i.e.*, to establish that such assistance so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place, Appellant must establish: (1) that the claim is of arguable merit; (2) that counsel had no reasonable strategic basis for his or her action or inaction; and (3) that, but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different.[2] *See Commonwealth v. Kimball*, 724 A.2d 326, 333 (Pa. 1999).[3] As a general proposition, "[c]ounsel is presumed to be effective and [the appellant] has the burden of proving otherwise." *Commonwealth v. Rivers*, 786 A.2d 923, 927 (Pa. 2001). Finally, "[f]ailure to meet any prong of the

---

[2]  *See* 42 Pa.C.S. § 9543(a)(2)(ii), regarding eligibility for relief from ineffective assistance of counsel.

[3] This standard derives from the holdings in *Strickland v. Washington*, 466 U.S. 668 (1984), and *Commonwealth v. Pierce*, 527 A.2d 973 (Pa. 1987).

test will defeat an ineffectiveness claim." *Commonwealth v. Wright*, 961 A.2d 119, 149 (Pa. 2008).

The lynchpin of Appellant's argument is *Commonwealth v. Maconeghy*, 171 A.3d 707 (Pa. 2017), wherein our Supreme Court affirmed our conclusion that expert testimony addressing the credibility of minor victims in a similar context was improperly admitted under § 5920.[4] *Maconeghy*, however, had not yet been decided when Appellant's trial took place, which significantly undercuts Appellant's heavy reliance upon that precedent. *See* Appellant's brief at 16-24 (drawing numerous parallels between the instant case and *Maconeghy*). Furthermore, Appellant's claim sounds in the context of ineffective assistance of counsel rather than trial court error, and he "must demonstrate that counsel was incompetent under the law

---

[4] In *Maconeghy*, the defendant was convicted of sexually assaulting his stepdaughter. *Id.* at 708. In addition to other testimony, the Commonwealth presented expert testimony from a physician, who conducted a review of the victim's medical history and a physical examination. *Id*. The physician discovered no physical evidence of abuse. During cross examination, defense counsel "repeatedly attempted to secure a concession that the medical evidence did not support a determination of abuse." *Id*. In response, the physician replied: "The history she provided to me pretty clearly indicated that she was sexually abused." *Id*. The physician also opined that his "medical encounter" with the child "indicated the child had been victimized." *Id.* Finally, on redirect, the physician stated: "I really strongly believe that was my medical conclusion that this child was victimized." *Id*. Based upon this testimony, our Supreme Court held that "an expert witness may not express an opinion that a particular complainant was a victim of sexual assault based upon witness accounts couched as a history, at least in the absence of physical evidence of abuse. We find that such testimony intrudes into the province of the jury . . . ." *Id*. at 779.

in existence at the time of trial." **Commonwealth v. Gribble**, 863 A.2d 455, 464 (Pa. 2004). It is practically axiomatic under Pennsylvania law that "[c]ounsel cannot be deemed ineffective for failing to predict developments or changes in the law." **Id**. The Supreme Court's guidance in **Maconeghy** was simply not available to Appellant's counsel (or, indeed, to anyone) at the time of trial, and we cannot evaluate counsel's actions in the light of that precedent.

This is not altogether fatal to Appellant's claims, as Appellant also relies upon § 5920(b)(3)'s independent prohibition against the admission of credibility opinions by experts in cases such as this one. Additionally, relevant precedent from both this Court and the Pennsylvania Supreme Court that **was** operative at the time of Appellant's trial also suggests such a prohibition is also recognized at Pennsylvania's common law. **See Commonwealth v. Seese**, 517 A.2d 920, 922 (Pa. 1986) ("[I]t was error to admit expert testimony as to the credibility of . . . the crime victim. . . . That testimony was necessar[ily] prejudicial to the appellant due to the fact that the prosecution relied primarily upon the perceived veracity of the victim to establish its case."); **see also Commonwealth v. Hernandez**, 615 A.2d 1337, 1340 (Pa.Super. 1992) ("We are mindful that the admissibility of expert testimony in child abuse cases must be evaluated cautiously in order to prevent encroachment upon the jury's function by the unfair enhancement of a child victim's credibility."). Appellant's claim for relief will have to find

purchase solely within the confines of § 5920 and the case law interpreting it that existed at the time of his trial. **See Gribble**, **supra** at 464.

Evaluating the arguable merit of Appellant's claims in the proper temporal posture, it appears that much of the complained-of testimony was specifically permitted pursuant to the "safe harbor" afforded by the statute, which collectively provides that "the witness may testify to facts and opinions regarding specific types of victim responses and victim behaviors" such as "the dynamics of sexual violence, victim responses to sexual violence[,] and the impact of sexual violence on victims during and after being assaulted." 42 Pa.C.S. §§ 5920(b)(1)-(2). Upon close inspection, Dr. Jenssen's testimony during her direct examination by the Commonwealth appears to fall entirely within this category of permissible testimony. In relevant part, Dr. Jenssen shared her expert knowledge to explain the lack of physical evidence of sexual assault in this case, and delineate typical behaviors exhibited by minor victims of interfamilial abuse such as delayed reporting and reluctant disclosure. **See** N.T. Trial II, 12/2/2015, at 78-89. Although Dr. Jenssen certainly discussed her expert opinions and relevant professional sources in the context of her experiences examining L.M. and N.D., such testimony appears[5] to be

---

[5] This Court has concluded that § 5920's remit distinguishes a number of precedents concerning the admissibility of expert testimony, including **Commonwealth v. Dunkle**, 602 A.2d 830, 837 (Pa. 1992) ("Not only is there no *need* for testimony about the reasons children may not come forward, but permitting it would infringe upon the jury's right to determine credibility."

admissible under § 5920(b)(2). **See** 42 Pa.C.S. § 5920(b)(2) (allowing testimony regarding "**specific** types of victim responses and behaviors"). Overall, Dr. Jenssen's direct testimony never explicitly addressed whether or not the complained-of sexual assaults in this case actually ever took place, and expressed no opinion regarding the overall truthfulness of L.M. or N.D. As such, Appellant's claims regarding trial counsel's failure to object to Dr. Jenssen's direct testimony are without arguable merit.[6] **See Commonwealth v. Carter**, 111 A.3d 1221, 1223 (Pa.Super. 2015) (concluding that expert

_____

(emphasis in original)) and **Commonwealth v. Balodis**, 747 A.2d 341, 345-46 (Pa. 2000) (relying upon **Dunkle** to disapprove of expert testimony regarding the "general characteristics of child victims of sexual abuse"). **See Commonwealth v. Carter**, 111 A.3d 1221, 1224 (Pa.Super. 2015). Our Supreme Court has agreed with this general conclusion, **see Commonwealth v. Olivo**, 127 A.3d 769, 780-81 (Pa. 2015) (adjudicating the constitutionality of § 5920 under Art. V, § 10(c) of the Pennsylvania Constitution), but has declined to specifically delineate the extent to which such prior precedent continues to constitute "good" law. **See Commonwealth v. Maconeghy**, 171 A.3d 707, 776 n.2 (Pa. 2017) ("The decisions in at least **Dunkle** and **Balodis** are impacted by the enactment of Section 5920 of the Judicial Code . . . . It is beyond the scope of this opinion to discuss the specific effect of the statute on these cases.").

[6] This Court has recently suggested a more-stringent "best practice" under § 5920 that would potentially render Dr. Jenssen's testimony in this case objectionable due to her direct familiarity with the underlying allegations: "The Commonwealth did not provide [the expert witness] with a factual account of the allegations against Appellant, and she testified without knowing anything about the allegations, the [v]ictim, or [the appellant] in order to comply with Section 5920." **Commonwealth v. Cramer**, 195 A.3d 594, 608 (Pa.Super. 2018). Instantly, **Cramer** is inapplicable in evaluating trial counsel's effectiveness, as it post-dates Appellant's trial. **See Commonwealth v. Gribble**, 863 A.2d 455, 464 (Pa. 2004) ("Counsel cannot be deemed ineffective for failing to predict developments or changes in the law.").

testimony regarding delayed reporting in child sexual assault victims was admissible under § 5920 where the expert "did not testify regarding this victim specifically or whether or not the alleged incidents actually occurred"); **see also Commonwealth v. Hernandez**, 615 A.2d 1337, 1344 (Pa.Super. 1992) ("[D]efense counsel cannot be deemed ineffective for not raising a meritless objection.").

We must conclude, however, that Appellant **has** established arguable merit with respect to significant portions of trial counsel's cross-examination of Dr. Jenssen, which undeniably adduced testimony directly speaking to the credibility of L.M. and N.D. Although Dr. Jenssen never explicitly stated whether or not she personally believed that a sexual assault had taken place in this case,[7] she repeatedly stated that she "believed" what L.M. and N.D. told her during their examinations and also vouched for them as "bright" children that were capable of speaking for themselves. **See** N.T. Trial II, 12/2/15, at 96-102. Facially, this testimony falls within the ambit of the statutory and common law prohibitions against experts offering credibility opinions in their testimony and would likely be inadmissible given a timely objection. **See** 42 Pa.C.S. § 5920(b)(3); **see also Seese**, **supra** at 922.

---

[7] Although Dr. Jenssen spoke, **generally**, to the credibility of L.M. and N.D., her statements of belief are explicitly limited to whether or not she had taken their accounts of their mother striking them at "face value." As such, she never explicitly addressed whether or not she believed the allegations of sexual abuse.

- 19 -

Consequently, we must assess whether Appellant's claim satisfies the remaining two prongs of the ineffectiveness standard.

Although we have serious concerns regarding the strategic basis of trial counsel's actions, we need not make a determination regarding that prong of the **Strickland** test for ineffectiveness.[8] Ultimately, Appellant's claim fails because he has not established prejudice as it is defined in the context of

---

[8] The learned Concurrence has suggested that Appellant's trial counsel had a reasonable strategic basis for his actions. The PCRA court reached the same conclusion, construing trial counsel's line of questioning as an attempt "to prove that she believed the allegedly abused children regardless of the inconsistencies in their testimony . . . ." PCRA Court Opinion, 2/5/19, at 11. We respectfully disagree and take a much dimmer view of trial counsel's questionable decision to adduce testimony: (1) that he knew at the time of trial would be inadmissible, **see** N.T. PCRA Hearing II, 1/28/19, at 15-16; (2) that he knew at the time of trial would lead to Dr. Jenssen bolstering the victim's credibility to the detriment of his client, **id**. at 17-19; (3) without a proper foundation to actually impeach Dr. Jenssen's credibility, **id**. at 21-22; and (4) without seeking any curative instruction from the trial court when this attempt at impeachment predictably faltered. **Id**. at 20. Any utility or advantage that might have been gained by impeaching Dr. Jenssen was undercut by these significant deficiencies in trial counsel's strategy. As such, Appellant's trial counsel should have either declined to pursue such a fraught strategy altogether, sought curative instructions, or elicited bias testimony from Dr. Jenssen with reference to the "thousands" of exams that she had conducted over the course of her career. **See** N.T. Trial II, 12/2/15, at 73. Even allowing that trial counsel possessed some strategic intent in this case, his plan was **not** reasonably calculated or executed. **See Commonwealth v. Rounds**, 542 A.2d 997, 999 (Pa. 1988) (opining in the context of expert opinion offered regarding the veracity of minor sexual assault victims that "[t]here is no reason that can be offered for permitting the damaging opinion of [the expert] to be admitted"). As such, I cannot join in the Concurrence's suggestion that trial counsel had a **reasonable** strategic basis for his actions. Such a conclusion is belied by trial counsel's own testimony.

these ineffectiveness claims under the PCRA. The central thesis of Appellant's argument concerning prejudice is as follows:

> Because the opinion, vouching for L.M.'s and N.D.'s credibility, came from a highly qualified and experienced child abuse pediatrician, and was buttressed with statements claiming scientific and statistical studies supported the opinion, there was **substantial risk of prejudice** for the Appellant. A jury **could easily be overly impressed or swayed** by the opinions of experts such as [Dr. Jenssen], particularly when surrounded with the hallmarks of the scientific method.

Appellant's brief at 23-24 (emphasis added).

Appellant's argument regarding prejudice has misconstrued the extraordinary burden of establishing prejudice under the PCRA. Although Appellant has recited an arguably correct standard of review for this question, Appellant's application claims that the "risk of prejudice," or the mere potential that the jury could have been "impressed or swayed" by Dr. Jenssen's testimony, is sufficient to establish prejudice. This claim erroneously asserts that trial counsel's actions were prejudicial under the "harmless error" standard. *See Commonwealth v. Story*, 383 A.2d 155, 164 (Pa. 1978) ("[A]n error cannot be held harmless unless the appellate court determines that the error could not have contributed to the verdict. Whenever there is a reasonable possibility that an error might have contributed to the conviction, the error is not harmless."). By contrast, ineffectiveness claims under the PCRA requires the affirmative demonstration of **actual prejudice**. *See Strickland v. Washington*, 466 U.S. 668, 686 (1984) ("The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so

- 21 -

undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result."). In sum, Appellant's discussion inappropriately conflates "harmless error" with the more-exacting "actual prejudice" standard that is applicable under the PCRA.[9/10]

Our Supreme Court clearly delineated this distinction in *Commonwealth v. Spotz*, 84 A.3d 294 (Pa. 2014) ("*Spotz II*"):

> [T]he test for prejudice in the ineffectiveness context is more exacting than the test for harmless error, and the burden of proof is on the defendant, not the Commonwealth. As a general and practical matter, it is more difficult for a defendant to prevail on a claim litigated through the lens of counsel ineffectiveness, rather than as a preserved claim of trial court error. . . .
>
> A defendant raising a claim of ineffective assistance of counsel is required to show actual prejudice; that is, that counsel's ineffectiveness was of such magnitude that it could have reasonably had an adverse effect on the outcome of the

---

[9] This is a critical distinction because the precedent relied upon by Appellant that resulted in the grant of a new trial uniformly arises in the context of claims of trial court error on appeal, as opposed to collateral review. *See Commonwealth v. Maconeghy*, 171 A.3d 707, 710 (Pa. 2017).

[10] The learned Concurrence suggests that we have committed an error by correctly reciting the standard for establishing prejudice under the PCRA for a claim of ineffective assistance of counsel, and then applying that standard to Appellant's arguments of record. We respectfully disagree. Our conclusion that Appellant has not sustained his burden of demonstrating "actual prejudice" is not the product of some mistake in law, but the natural consequence of Appellant presenting insufficient evidence to establish such. While we commend the learned Concurrence for its solicitude concerning the heavy burden posed by such a standard, we are bound by well-established precedent in this area of law. *See Commonwealth v. Williams*, 9 A.3d 613, 619 n.7 (Pa. 2010) ("[I]t is more difficult to obtain relief on collateral review because *Strickland* places a heavier burden on the defendant.").

proceedings. This standard is different from the harmless error analysis that is typically applied when determining whether the trial court erred in taking or failing to take certain action. . . . [The harmless error standard] places the burden on the Commonwealth to show that the error did not contribute to the verdict beyond a reasonable doubt, is a lesser standard than the **Pierce** prejudice standard, which requires the defendant to show that counsel's conduct had an actual adverse effect on the outcome of the proceedings. This distinction appropriately arises from the difference between a direct attack on error occurring at trial and a collateral attack on the stewardship of counsel. In a collateral attack, we first presume that counsel is effective, and that not every error by counsel can or will result in a constitutional violation of a defendant's Sixth Amendment right to counsel.

*Id*. at 315. Instantly, Appellant's averments concerning prejudice are unavailing as a result of this distinction, as Appellant's claims regarding prejudice are confined to unapplied speculation regarding how Dr. Jenssen's testimony **might** have impacted the proceedings below. This Court has rejected such arguments, concluding that "[u]nsupported speculation does not establish reasonable probability" that the outcome of the proceedings would have been different. **Commonwealth v. Charleston**, 94 A.3d 1012, 1026 (Pa.Super. 2014).

"In making [a prejudice] determination, a court hearing an ineffectiveness claim must consider the **totality of the evidence** before the judge or jury . . . ." **Commonwealth v. Lesko**, 15 A.3d 345, 383 (Pa. 2011) (emphasis in original).[11] Instantly, the Commonwealth's case rested largely

_____

[11] The learned Concurrence has also averred that we have impermissibly conflated sufficiency of the evidence with actual prejudice. However, our

- 23 -

upon testimonials from L.M. and N.D. that were uncorroborated by physical evidence, but Appellant was unsuccessful in eliciting significant inconsistencies or falsities in their respective testimonies. **See** N.T. Trial I, 12/1/15, at 64-102 (cross-examination of L.M.); **see also** N.T. Trial II, 12/2/15, at 39-58 (cross-examination of N.D.). At best, Appellant raised a question regarding whether Appellant's bedroom door had a lock. **Compare** N.T. Trial I, 12/1/15, at 69-70 (L.M. testifying that Appellant would lock the door to the bedroom when the assaults took place) **with** N.T. Trial III, 12/3/15, at 28-29 (testimony that the bedroom could not be locked, but was held close by a large container filled with coins). Although uncorroborated with physical evidence, the victim testimonials in this case also remained uncontroverted at the close of the proceedings. As such, it seems clear that the discrepancy that resulted from trial counsel's erroneous cross-examination of Dr. Jenssen was **not** of a sufficient magnitude to undermine confidence in the jury's verdict based upon the arguments advanced by Appellant. **Accord Spotz**, **supra** at 315; **cf. Commonwealth v. Sparks**, 539 A.2d 887, 890 (Pa.Super. 1988)

---

discussion of the totality of the evidence presented at trial is commanded by the relevant precedent of our Supreme Court. **See Commonwealth v. Lesko**, 15 A.3d 345, 383 (Pa. 2011). The point of this evidentiary review is **not** to establish that the Commonwealth's case was legally "sufficient," but to ascertain whether trial counsel's error had a palpable effect upon the outcome of the proceeding such that it constitutes "actual prejudice." Based upon our review of the totality of the evidence, we conclude that it did not. Tellingly, the Concurrence does not explicitly opine regarding whether or not it would conclude that "actual prejudice" resulted in this controversy.

("The Commonwealth's evidence was not overwhelming, and the contradictions and inadequacies therein, if pointed out to the jury, may well have created reasonable doubt as to whether appellant had committed the crimes with which he was charged.").

In totality, Appellant has failed to demonstrate actual prejudice with respect to the arguable bolstering of L.M.'s and N.D.'s respective credibility by Dr. Jenssen's testimony during cross-examination by Appellant's trial counsel. As such, Appellant's claim for relief must fail.[12]

Order affirmed.

Judge Shogan joins the memorandum.

Judge Strassburger files a concurring memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/24/20

---

[12] Although we affirm on a separate basis from that originally espoused by the PCRA court, "[t]his Court may affirm a PCRA court's decision on any grounds if the record supports it." *Commonwealth v. Ford*, 44 A.3d 1190, 1194 (Pa.Super. 2012).